**In re Johan PAZ, Debtor.**

**Bankruptcy No. 94–50707.**

United States Bankruptcy Court,
S.D. Georgia,
Waycross Division.

March 30, 1995.

Franklin D. Hayes, Douglas, GA, for debtor.

Daniell S. Landers, Waycross, GA, for Gold Key Lease, Inc.

Sylvia Ford Brown, Chapter 13 Trustee, Savannah, GA.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Motion for Relief From Stay filed by Gold Key Lease, Inc., ("Gold Key") a creditor in this Chapter 13 case. At issue is the characterization of an agreement as either a lease which must be assumed or rejected, or a security instrument capable of bifurcation into secured and unsecured component claims. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(G). Based on the following discussion, the Court will deny Gold Key's Motion for Relief From Stay subject to the requirement that Debtor amend his plan.

### FINDINGS OF FACT

On June 16, 1994, Johan Paz ("Debtor") and Nalley Brunswick Automobiles, Inc., ("Nalley") entered into an agreement which Nalley subsequently assigned to Gold Key. In the agreement, Debtor obtained the right to possession and use of a new 1994 GMC Sonoma truck. In return, Debtor agreed to pay Gold Key the sum of Two Hundred Seventy-five Dollars and Twenty-six Cents ($275.26) per month for a period of forty-eight months. Debtor paid Six Hundred Sixteen Dollars and Twenty-six Cents ($616.26) at the inception of the agreement, which included a security deposit of Three Hundred Dollars ($300.00). Upon expiration of the

agreement, Debtor would have had the option of purchasing the vehicle for either Three Thousand Four Hundred Fifty-eight Dollars and Thirty-six Cents ($3,458.36) or Ninety-five percent (95%) of the value of the vehicle as determined by the NADA Official Wholesale Used Car Trade-in Guide, whichever is less. Debtor had the option to purchase the vehicle during the term of the agreement by paying Gold Key a sum determined by the number of unpaid payments in relation to the NADA Wholesale value. The agreement is entitled "Lease Agreement—Gold Key", and is the subject of this dispute between Debtor and Gold Key.

Debtor testified that he was told he would be permitted to keep the car at the conclusion of the 48 month term if he would keep paying the same payment for twelve more months. At the end of that additional twelve month term he would acquire ownership. If Debtor were to exercise this option, the twelve additional payments, totaling Three Thousand Three Hundred Three Dollars and Twelve Cents ($3,303.12), would approximate the predicted residual value of the vehicle. The cash price of the car was Ten Thousand Dollars ($10,000.00). The title to the vehicle remained in Gold Key's name at all times during the term of the agreement.

On February 14, 1995, this Court granted Gold Key's Motion to Modify the Automatic Stay and directed Debtor to turn the vehicle over to Gold Key until Debtor could provide proof of insurance on the vehicle or until further order. To date, there is no evidence of proof of insurance.

Gold Key has filed a proof of claim for Twelve Thousand Seven Hundred Twenty-five Dollars and Sixty-four Cents ($12,-725.64). Gold Key's proof of claim states that the basis for the debt is a lease, and asserts secured status. Debtor contends that the agreement is a disguised sale, and proposes to bifurcate Gold Key's claim into secured and unsecured components. Gold Key contends that the agreement is a true lease, and Debtor must either assume or reject the lease without modifying its terms.

## CONCLUSION OF LAW

The characterization of this agreement as either a lease or sale will resolve the dispute between the parties and determine how Gold Key's claim will be treated in this bankruptcy case. In order to understand why such a characterization impacts so profoundly upon the bankruptcy process, it is necessary to review the economic circumstances associated with leasing compared to purchasing.

A transaction is often characterized as a lease rather than a sale so that the lessee can write off the lease payments as a tax deductible expense rather than amortizing the purchase of the property as a capital asset. A lease may provide for the lessee to be able to surrender the property and relieve himself from the responsibility to continue payments on the property. When the lessee opts for that result, there would be no incentive for the lessee to argue for recharacterization.

On the other hand, where a lessee plans to become the owner of the property, the lease transaction may not favor his interest. Lessee obtains no equity, or ownership interest, in property under a lease. The lease fees and costs associated with a lease agreement often amount to a significant increase over what a lessee would pay to purchase goods in a cash or credit transaction. For example, the ultimate price Debtor would pay for the subject vehicle at the end of the lease term upon exercising the purchase option would be a minimum of $16,515.60 as compared to the original purchase price of $10,000.00 had Debtor paid cash.

Financing the vehicle in a purchase transaction for the same five year period would yield a significantly lower cost over the same period as the lease. For example, assuming the cost of the vehicle is $10,000.00, including a sales tax of 6% the purchaser would need to finance $10,600.00 for the purchase of the vehicle. At a 7% interest rate, amortized over a five year period, the purchaser would pay $209.89 per month for a total of $12,-593.40. Of that amount, $1993.40 would represent interest.[1] When one compares the

1. These figures are offered for illustrative purposes only. Individual lending policies vary between institutions. For the purposes of this ex-
ample, the Court assumes no money down and no fees or extraneous charges.

total amount spent over the same period, the cost of leasing versus purchasing becomes apparent.

The fact that debtors are often uninformed regarding the consequences of the nature of a transaction is not surprising given the fact that the law does not require the disclosure of the purchase price of the vehicle or the interest rate in a leasing transaction. Entering into a lease with an option to buy allows creditors to finance the sale of a new car to marginally credit worthy purchasers and charge a higher price and a higher interest rate. Both factors are not readily apparent to the lessee aspiring to purchase.

Bankruptcy adds another dimension to the leasing transaction. Lessees who file for relief under the Bankruptcy Code may propose to characterize the transaction as a sale, as in this case, then value the property and bifurcate the claim between secured and unsecured components. The significance of this distinction is aptly described as follows:

> The Code permits a debtor to modify the rights of secured creditors and to remain in possession of the secured property. [footnote omitted]. The plan must provide that the secured creditor receive 100 percent of the fair market value of the property plus interest, but the difference between the value of the property and the debt secured by the property is treated as an unsecured claim. On this portion of the claim, the creditor may receive only pennies on the dollar. In ordinary usage, this has become known as the cram down.

> The theory behind the cram down starts with the premise that the debtor is unable to pay debts in full and on schedule. Thus, the creditor is not going to be paid by the debtor, at least, not in accordance with the terms of the debt. At most, the creditor hopes to receive the value of the property after the property has been repossessed and disposed of at a commercially reasonable sale. Any deficiency is probably uncollectible. By paying the fair market value of the property with interest plus a portion of the "deficiency" through the plan, the creditor is left in a better position

than the creditor would have been had the debtor not filed for bankruptcy.

Lessors are treated differently under the Code. A debtor's unexpired lease must be assumed, rejected, or assigned. [footnote omitted]. If a lease is rejected, the property must be returned to the lessor and the debtor is no longer bound by the lease, although the lessor may have a claim for damages arising from the rejection or for pre and postpetition back rent. [footnote omitted]. If the lease is assumed, it must be accepted according to its terms. The rental payments called for under the lease must be paid, any default must be cured within a reasonable time, and the lessor must be given adequate assurance of future performance. [footnote omitted]. A lease is not subject to a cram down and the debtor has no right to modify any of its terms. If an agreement is a "true" lease, the only way for the debtor to remain in possession of the property is to assume the agreement according to its terms.

This makes sense. A cram down is permitted in secured transactions because it leaves a secured creditor at least as well off as the creditor would have been had the bankruptcy not been filed. A retail creditor wants to get paid. Aside from automobile dealers, most retail sellers have no interest in recovering property from the debtor because they have no interest in selling used property. A lessor, however, does have an interest in recovering property from a debtor. Unlike most retail sellers, leasing or selling used property is an ordinary part of a lessor's business. A cram down would not leave a lessor as well off as it would have been had the bankruptcy not been filed.

If a Chapter 13 plan proposes a cram down for what is in fact a "true" lease, the plan is proposing something that is not authorized by the Code. The Code does not, however, provide any test for determining what is or is not a "true" lease. For the answer to this question we have to

look outside the Code to the substantive state law.[2]

As the above discussion reveals, creditors gain certain advantages by characterizing agreements as leases. Outside of bankruptcy, lessors are not forced to comply with the often complex and time consuming requirements imposed upon secured creditors by Georgia's Uniform Commercial Code[3] in the event a debtor fails to make payments. The same requirements which hamper a secured creditor's efforts toward foreclosure benefit a debtor by making it easier to keep the property. Besides obtaining a generally higher price on leasing agreements, lessor creditors are able to achieve better treatment in bankruptcy than secured creditors.

While Congress has specified the treatment each species of creditor is to receive in bankruptcy, the role of defining what constitutes a security interest versus a lease is left to the state legislature. *Rent–A–Center, Inc. v. Mahoney (In re Mahoney)*, 153 B.R. 174, 176 (E.D.Mich.1992) (citing *In re White*, 109 B.R. 768, 769 (Bankr.S.D.Ohio 1989)). The Georgia Code provides the Court with guidance. The Georgia Legislature amended O.C.G.A. § 11–1–201(37) in 1993 to provide a codified distinction between documents creating security interests and lease agreements.[4] The agreement before the Court, having been entered into after the effective date of the amendments,[5] is subject to scrutiny under the amended law. O.C.G.A. § 11–1–201(37) provides in pertinent part:

> Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and

(a) The original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

(d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that

(a) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,

(b) The lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

(c) The lessee has an option to renew the lease or to become the owner of the goods,

(d) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(e) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value

---

**2.** Barkley Clark et al., *"RENT–TO–OWN" AGREEMENTS IN BANKRUPTCY: SALES OR LEASES?*, 2 Am.Bankr.Inst.L.Rev. 115, 123–124 (Spring, 1994).

**3.** O.C.G.A. § 11–1–101 et seq.

**4.** For a more complete discussion of the 1993 amendments to the Georgia Commercial Code, see Sarah B. King, *LEASES: PROVIDE REGULATIONS RELATING TO LEASES OF GOODS*, 10 Ga.St.U.L.Rev. 34 (1993).

**5.** July 1, 1993.

of the goods at the time the option is to be performed.

For purposes of this subsection (37):

(x) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonable predictable cost of performing under the lease agreement if the option is not exercised;

(y) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; and

(z) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

O.C.G.A. § 11–1–201(37) (Michie 1994).

The 1993 amendment to section 11–1–201(37) is largely consistent with Georgia case law prior to the amendment.[6] The amendment provides a yardstick for the Court to measure the facts of each individual case. In order to find that the transaction entered into between Debtor and Gold Key

constitutes a security agreement the Court must find *both* that Debtor is not able to terminate the agreement *and* that one of the conditions in subsections (a)–(d) is satisfied. The Court may consider as evidence any facts in the case consistent with those subsections (a)–(e) whose mere presence the Georgia Legislature has designated as insufficient to create a security agreement.

The evidence submitted to the Court does not reveal that Debtor was able to terminate the lease prior to the expiration of the term of the agreement. Although provisions of the agreement refer to a second side of the document, both the evidence accompanying Gold Key's proof of claim and the evidence submitted by Gold Key at the hearing had only one side. The Court will not speculate whether the document as signed contains provisions not submitted into evidence. Therefore, the Court finds that the contract did not give Debtor the power to terminate the agreement prior to the expiration of the term of the agreement.

However, finding that the agreement is not subject to termination by Debtor is insufficient to establish that the document is a security agreement. Upon review of the additional factors cited by the Georgia Code which create a security agreement, the Court finds that none of those factors are present in this case. Specifically, the Court finds:

(a) *The original term of the lease is less than the remaining economic life of the goods at the time Debtor entered into the agreement.*

The vehicle Debtor obtained through the present agreement was new at the time the contract was formed. The term of the lease is four years. This Court cannot find at the end of the four year lease that the vehicle would have no economic value.

**6.** See generally, *Tompkins v. Mayers, et al.,* 209 Ga.App. 809, 434 S.E.2d 798 (1993); *Mejia v. Citizens & Southern Bank,* 175 Ga.App. 80, 332 S.E.2d 170 (1985); *G.R. Pierce v. Leasing Int'l., Inc., et al.,* 142 Ga.App. 371, 235 S.E.2d 752 (1977); *Rollins Communications, Inc., etc. v. Georgia Institute of Real Estate, Inc.,* 140 Ga.App. 448, 231 S.E.2d 397 (1976); *Redfern Meats, Inc.* v. *Hertz Corp., et al.,* 134 Ga.App. 381, 215 S.E.2d 10 (1975); *H.C. McGuire v. Assoc. Capital Services Corp., et al.,* 133 Ga.App. 408, 210 S.E.2d 862 (1974); *Mays v. Citizens & Southern Nat'l. Bank,* 132 Ga.App. 602, 208 S.E.2d 614 (1974), overruled on other grounds, *Mock v. Canterbury Realty Co.,* 152 Ga.App. 872, 264 S.E.2d 489 (1980).

(b) *Debtor is neither bound to renew the lease for the remaining economic life of the vehicle, nor bound to purchase the vehicle.*

While the agreement provided that Debtor was able to exercise an option to purchase the vehicle, Debtor was under no obligation to do so or to renew the lease. Indeed, the document was silent as to whether Debtor was able to renew the lease. The fact that Debtor was given the opportunity to purchase the vehicle by continuing payments for an additional twelve months does not create an obligation binding Debtor to renew the lease.[7]

(c) *The lease does not provide an option to renew for nominal consideration.*

The lease is silent regarding renewal. Hence, this factor is inapplicable.

(d) *Debtor's option to become the owner cannot be exercised for nominal consideration.*

The lease provides that Debtor may become the owner of the vehicle upon payment of either $3,458.36 (estimated wholesale value) or 95% of the NADA Wholesale value at the end of the contract's natural term. Should Debtor elect to purchase the vehicle prior to the natural expiration of the term, the price would be calculated by reference to the unpaid lease payments in conjunction with the NADA Wholesale value. In either instance, reference is made to the fair market value of the vehicle at the time the option is exercised. The Georgia Code provides that fair market value is not nominal. O.C.G.A. § 11–1–201(37)(x)(ii).[8]

A review of the cost Debtor would ultimately pay for the vehicle supports Gold Key's assertion that the purchase price is not nominal. The total payments called for under the lease are Thirteen Thousand Two Hundred Twelve Dollars and Forty-eight Cents ($13,212.48). Of that amount, Four Thousand Three Hundred Eighty-six Dollars and Four Cents ($4,386.04) represent taxes, fees, and lease charges. The remaining sum of Eight Thousand Eight Hundred Twenty-six Dollars and Forty-four Cents ($8,826.44) represents payments toward reduction of the vehicle's actual cost should the option to purchase be exercised.

Considering the lowest possible payout by Debtor in exercising the option ($3,303.12 by continuing payments in the amount called for in the agreement for an additional 12 months) Debtor would ultimately pay Twelve Thousand One Hundred Twenty-nine Dollars and Fifty-six Cents ($12,129.56) toward the capital cost of the vehicle under the agreement. A residual cost of $3,303.12 is not nominal in light of either the ultimate capital cost of the vehicle or the original purchase price of $10,000.00.

The Court finds that none of the factors stated in the Georgia Code which would establish the present agreement as a security interest are present. The Court notes that several factors cited by the Georgia Code in subsections (a)–(e) are present. Specifically, the total amount to be paid under the agreement approximates the fair market value of the vehicle at the inception of the agreement (if the purchase option is exercised), Debtor pays applicable taxes through the agreement, and Debtor has an option to become the owner of the goods at the end of the agreement. However, there are merely additional factors the Court considers in evaluating the facts of each case. Standing alone or together, they do not evidence a security agreement.

---

7. This testimony may be inadmissible in accordance with the parol evidence rule. As this opinion indicates, the admission of the testimony does not effect the outcome of the case.

8. Prior to the 1993 amendments, determination of nominal versus fair market value was a difficult endeavor. It is easy enough to see how a 12 or 24 month lease with a fair market value residual could never be a sale. Similarly, it is easy enough to see how a 58 month lease with a residual of $500.00 may be a sale. If a lease runs long enough, the value of the property will dissipate to a point where it may become virtually worthless. If this happens, and if the lessee is obligated to pay the lease according to its terms for such a time period, the lease may be a sale even though the buy out price is approximately equal to the fair market value of the goods. This scenario might satisfy part (a) above (O.C.G.A. § 11–1–201(37)(a) (of (a)–(d)) and require that the transaction be characterized as a lease.

Considering the facts of this case in light of the plain language of the Georgia Code, the Court finds that the present agreement constitutes a lease under Georgia law. O.C.G.A. § 11–1–201(37). As such, Gold Key's treatment in this bankruptcy case is governed by 11 U.S.C. § 365.

Pursuant to 11 U.S.C. § 365(d)(2), the Chapter 13 trustee will be directed to either assume or reject the Gold Key lease within twenty (20) days of the entry of this memorandum opinion and order. Should Debtor assume the lease, Debtor must comply with the Court's directive that Debtor obtain insurance on the vehicle. Should Debtor reject the lease, the automatic stay will be modified to allow Gold Key to dispose of the vehicle. Gold Key's Motion for Relief From Stay will be denied pending assumption or rejection of the lease.

An order in accordance with this memorandum opinion will be entered on this date.

### ORDER

A Motion for Relief From Stay was filed by Gold Key Lease, Inc. ("Gold Key"), a creditor in this Chapter 13 case. This order is entered in accordance with the memorandum opinion entered following the hearing pursuant to Fed.R.Bankr.P. 7052.

It is hereby

ORDERED that the motion for stay relief is denied subject to the following requirements which must be satisfied within twenty (20) days of the entry of this order:

1. The Debtor must amend his Chapter 13 plan to provide for either an assumption or rejection of the Gold Key lease and, if the lease is assumed, provide for the curing of arrearages under the plan.

2. Within the time specified, the Debtor must provide insurance on the vehicle and, further, provide proof of that insurance to Gold Key.

If either of the two foregoing requirements remain unsatisfied after twenty (20) days from the date of the entry of this order, upon submission of an affidavit to that affect by

Gold Key, the motion for stay relief will be granted.

SO ORDERED.